UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>CASPER MIKKELSEN, a/k/a "Carsten Nielsen," a/k/a "Brian Thomson," a/k/a "Thomas Jensen" and a/k/a "Casper Muller,"<br><br>　　　　　　　Defendant. | CIVIL ACTION NO:<br><br>**Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties Under the Commodity Exchange Act.**<br><br>**JURY TRIAL DEMANDED** |

The Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its attorneys, hereby alleges as follows:

## I.　SUMMARY

1.　Since at least 2015 and continuing to the present (the "Relevant Period"), Casper Mikkelsen, a/k/a "Carsten Nielsen" a/k/a "Brian Thomson" a/k/a "Thomas Jensen" a/k/a "Casper Muller" ("Casper Mikkelsen" or "Mikkelsen"), engaged in a fraudulent scheme to solicit and misappropriate money from at least 101 individuals and entities ("clients") who invested their funds with an alleged company called GNTFX to trade retail leveraged or margined off-exchange foreign currency contracts ("forex").

2.　Pursuant to this scheme, Mikkelsen promised clients he would use his discretion to trade forex on their behalf and clients in turn invested at least $1.5 million. Rather than using those funds for forex trading as promised, Mikkelsen instead misappropriated at least some clients' funds.

1

3. In the course of this fraudulent scheme and during the Relevant Period, Mikkelsen—who was not registered with the Commission in any capacity—made material misrepresentations and omissions to clients, including in part that: (1) he would trade their funds to buy and sell forex; and (2) clients' account statements accurately reflected profits and losses of forex trades executed on their behalf. Further, in order to induce clients to invest in this scheme, Mikkelsen provided clients and/or gave them access to his historical trading performance results that reported fictitious profits.

4. In the course of this fraudulent scheme and during the Relevant Period, Casper Mikkelsen misappropriated at least $737,000 of client funds for his personal use. In sum, clients lost a total of at least $1.19 million and the remainder of client funds was used for purposes other than trading forex including, in part, being returned to some clients as is typical in a Ponzi scheme.

5. In order to conceal the misappropriation of client funds and continue to perpetuate this scheme, Mikkelsen was responsible for generating fake account trading statements for clients showing fictitious forex trades and profits. Mikkelsen then provided clients access to these fake account statements.

6. By this conduct, and the conduct further described herein, Casper Mikkelsen violated Section 4b(a)(2)(A), (B), and (C) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 6b(a)(2)(A), (B), (C) (2018), and Commission Regulation ("Regulation") 5.2(b), 17 C.F.R. § 5.2(b) (2019) (" Forex Fraud Violations"). Casper Mikkelsen also violated Section 4m(1) of the Act, 7 U.S.C § 6m(1) (2018), and Regulation 5.3(a)(3), 17 C.F.R. § 5.3(a)(3) (2019) ("CTA Registration Violations"), and Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A), (B) (2018) ("CTA Fraud Violation").

7. The Commission brings this action under Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), to enjoin Mikkelsen's unlawful acts and practices and to compel his compliance with the Act and the Regulations. In addition, the Commission seeks civil monetary penalties, and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

8. Unless restrained and enjoined by this Court, Defendant will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices.

## II.     JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a) (2018) authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

10. The Commission possesses jurisdiction over the forex transactions at issue in this case under 7 U.S.C. § 13a-1 (2018), and Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2018).

11. Venue lies with this Court under Section 6c(e) of the Act because Defendant transacted business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

### III.     PARTIES

12.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for enforcing the provisions of the Act, 7 U.S.C. §§ 1-26 (2018), and the Regulations promulgated thereunder, 17 C.F.R. Pt. 1-190 (2019).

13.     Defendant **Casper Mikkelsen** is a resident of Denmark and has used multiple aliases and now has legally changed his name to Casper Muller. He has never been registered with the Commission in any capacity.

### IV.     FACTS

**A.  Casper Mikkelsen's False Statements about GNTFX**

14.     During the Relevant Period, Casper Mikkelsen solicited clients through websites, emails, Twitter, and through at least one promoter ("Promoter").  Casper Mikkelsen solicited these clients to open accounts at GNTFX, which purported to provide forex brokerage services to the retail public.

15.     Casper Mikkelsen registered a website for GNTFX, gntfx.com (the "GNTFX Website" or "Website") that he used to solicit clients for GNTFX with false or misleading statements.

16.     Using GNTFX's Website, Casper Mikkelsen misrepresented to potential and/or existing clients that "Your deposit with GNTFX is always safe as all money is deposited into segregated accounts."  The Website further misrepresented to clients that "All company funds are segregated from client funds here at GNTFX.  When client funds are received, they are placed into the company's fiduciary client bank accounts, which are segregated.  What this means is they are off the balance sheet.  Even in the unlikely event that the company defaults, these

funds cannot be used to pay back creditors." And through the GNTFX Website, Casper Mikkelsen also misrepresented to clients that the Website offered them the ability to use an "award-winning trading platform" and that "with a click of your mouse" you can "clone a professional forex trader," namely, a process by which trades that were supposedly executed by a professional trader are automatically copied onto managed client accounts.

17. These statements on the Website were false. Mikkelsen did not disclose that clients' deposits were not safe since their deposits had been misappropriated. Mikkelsen did not disclose that there were no segregated fiduciary client bank accounts into which clients' money had been deposited—rather, client deposits and funds were commingled with funds from other clients and sources. And Mikkelsen did not disclose that there was no professional trader whose trades were cloned onto client accounts.

18. Mikkelsen also used the GNTFX website to claim that GNTFX had an office in Marina Towers, Belize City. Further, according to GNTFX's twitter account, GNTFX was a "forex brokerage company in Belize, U.S." In addition, in order to induce a potential client to invest with GNTFX, on April 11, 2017, a client received an email from GNTFX which included a license purportedly issued by the Belize International Financial Services Commission ("IFSC"). This license claimed to permit GNTFX, using the name GNTXF Group Limited, to conduct business in Belize. This was a sham since the IFSC never issued this license, GNTFX was never registered as an International Business Company in Belize, and Mikkelsen directed the creation of this fraudulent license.

19. Using the GNTFX Website, Casper Mikkelsen touted a relationship between GNTFX and a major international bank ("Bank X"). Bank X did not have any relationship with GNTFX; indeed, no firm named GNTFX was ever a client of Bank X.

20. Casper Mikkelsen also used the GNTFX Website to portray GNTFX as a New York-based financial company: "the term 'home office' is 55 Water Street, 50th Floor, New York, NY 10041 USA." The website informs clients that any legal dispute regarding GNTFX will be resolved in Manhattan: "Any judicial, administrative action or proceeding . . . shall be held, at the sole discretion of GNTFX within New York County, State of New York, exclusively." But GNTFX never had an office at 55 Water Street. Mikkelsen designed these misrepresentations to create the false impression that GNTFX was a New York financial company amenable to legal undertakings in this jurisdiction in order to fraudulently induce clients to invest with GNTFX.

21. Casper Mikkelsen also communicated with clients through a number of GNTFX email addresses. For example, he used or directed the use of at least three email addresses for GNTFX: support@gntfx.com, support@gntfx.zendesk.com, and support@gntfxhelp.com (the "GNTFX Email Addresses") for these communications. The GNTFX Email Addresses were used by Mikkelsen or at his direction to send clients instructions on where they needed to wire their funds to open forex accounts at GNTFX. Emails sent to clients from the GNTFX Email Addresses were typically signed by names including "Joe," "Adam," "Robert," or "Robert Anderson, Head of Support at GNTFX," thus concealing the fact that they were sent, or directed to be sent, by Mikkelsen.

B. **Casper Mikkelsen Solicited Clients with False Information about his Historical Trading Performance**

22. In order to induce clients to invest their funds with GNTFX, Mikkelsen also provided or made available to clients false information about his historical trading performance.

23. Mikkelsen routinely fraudulently solicited potential GNTFX clients through a company he controlled called Flipsidefx. Mikkelsen registered a website called flipsidefx.com in

2012 and used an email address at support@flipsidefx.com ("Flipside Email Address") to communicate with Flipsidefx clients to induce them to become GNTFX clients.  Using the name "Brian" or "Brian Thomson" and the Flipside Email Address, Mikkelsen fraudulently solicited clients to trade off exchange foreign currency, such as the euro and the British pound sterling through GNTFX.  Mikkelsen communicated to Flipsidefx clients that he earned historical returns of up to 154% per month using the Flipsidefx trading system.  This statement of his profitable historical returns at Flipsidefx was false because he never generated such profits.  Mikkelsen further told Flipsidefx clients that if they opened accounts at GNTFX, he would use the same Flipsidefx trading system to generate profits on their behalf at GNTFX.  Mikkelsen also used the Flipsidefx Email Address to provide clients with trading advice and strategy and what type of forex products he was trading on their behalf and when to buy and sell and to explain how he would manage their forex trading accounts at GNTFX.

24.    Casper Mikkelsen also disseminated and/or made available false historical return information to clients through at least one Promoter.  Casper Mikkelsen and the Promoter had an agreement under which Mikkelsen opened an account with GNTFX and traded forex on behalf of the Promoter and then the Promoter in turn solicited clients on behalf of GNTFX.

25.    Mikkelsen provided the Promoter with access to Mikkelsen's account showing trading profits that Mikkelsen knew were fictitious.  For example, these fake statements showed that from on or about December 25, 2015 to on or about October 28, 2016, the Promoter's account grew from $4,000 to over $26,000 in less than a year, that is, a 555% return on investment when, in fact, Mikkelsen never traded Promoter's or any other GNTFX clients' account.  In return, the Promoter set up a website called fxturtletrader.com ("Turtletrader Website") in which he listed these purported historical returns earned by Mikkelsen.  Mikkelsen

also knew that the Promoter would disseminate and/or make available this list of fictitious trading profits to prospective GNTFX clients through the Turtletrader Website; indeed, the Promoter frequently shared the Turtletrader Website and its list of the GNTFX's high returns with Casper Mikkelsen.

### C. Casper Mikkelsen Directs Clients to Send Funds to Accounts

26. Through the GNTFX Email Addresses, most clients were directed to deposit their funds into accounts at a bank in Colorado (the "Colorado Bank Accounts") and others were directed to deposit their funds into a Latvian bank account, a Portuguese bank account, and/or an American ecommerce company. Client funds were then: 1) withdrawn in part by Mikkelsen through the use of his debit card from the Colorado Bank Accounts; 2) transferred from the Colorado Bank Accounts to a foreign bank account and then in part to a Bitcoin address for Mikkelsen's benefit; 3) used to pay certain clients purported forex trading profits (as is typical in a Ponzi scheme); 4) transferred in part from the Latvian bank account to another account for the benefit of Mikkelsen; and 5) transferred from the American ecommerce company account to bank accounts in Denmark under Mikkelsen's control.

27. Clients deposited their funds into the Colorado Bank Accounts for the purpose of trading forex. Instead of trading these funds as promised, these funds were never traded as promised and instead were misappropriated by Mikkelsen and used for other purposes. For example, at least $574,000 was transferred from the Colorado Bank Accounts to purchase Bitcoin for the benefit of Casper Mikkelsen. In sum, no funds from the Colorado Bank Accounts were ever used for forex trading.

28. Clients also sent funds to the Latvian bank account, the American ecommerce company account, and the Portuguese account for the purpose of trading forex. Instead of

8

trading forex as promised, Mikkelsen used these client funds in part for his own purposes such as foreign travel, health insurance, furniture, car loans, art purchases, clothing, ATM withdrawals, and/or debit card transfers. None of the funds sent to the Latvian bank account, to the American ecommerce company account, and to the Portuguese account were ever used for forex trading.

### D. Casper Mikkelsen Was Responsible for Creating False Account Statements

29. Casper Mikkelsen was responsible for knowingly creating fake account statements and providing clients access to these fake statements on the GNTFX Website so that he could conceal his misappropriation of client funds and continue to perpetuate this scheme.

30. These fake account statements were created as follows. Casper Mikkelsen would first determine how much he wanted clients to profit or at times to lose. Account statements would then be created using fictitious winning and losing trades, giving the appearance of actual forex trades executed on behalf of clients. These account statements further showed order numbers for each trade and fictitious balances that purported to reflect overall profitable trading activity.

31. For example, on or about July 7, 2015, Mikkelsen determined that on certain days, client statements for the upcoming week would show winning trades earning 25-35 pips each. On other days, these statements would show a winning trade earning 25-35 pips and one break-even trade. Still on other days, these statements would show one winning trade earning about 25-35 pips and one trade losing approximately 20-30 pips. By way of example, on a standard contract of 100,000 units, a one pip movement is equal to $10, so a winning trade on one such contract earning 35 pips would result in earnings of $350. None of these trades were ever executed on behalf of these clients and they were all fictitious.

32. Mikkelsen then made these fake account statements available to his clients on the GNTFX Website. For example, from on or about November 2016 to July 2017, one client saw

his forex investments grow on these fake statements to a balance of $23,494.24 from $11,700. In another case, a client account statement falsely showed 486% profits in a 16-month period for fictitious forex trading.

33. Mikkelsen also made available fake account statements on the GNTFX Website to induce potential new clients to open and fund their trading accounts. Potential new clients were provided access to a demonstration version of the GNTFX trading platform on the Website where fake account statements with fictitious trades and profits were provided to potential clients trading on a demonstration account ("Fake Demo Statement"). For example, on March 10, 2015, Mikkelsen decided that the Fake Demo Statement would show winning trades earning in the range of 100-120 pips. All of the trades and profits on the Fake Demo Statement were fictitious and were designed to lure new clients into this scheme.

### E. GNTFX Failed to Pay Clients Who Requested To Withdraw Money From Their Accounts

34. Throughout the life of the scheme, clients invested at least $1.5 million for the purpose of trading forex and routinely made requests to withdraw their funds through the GNTFX Email Addresses. As is typical in Ponzi schemes, Casper Mikkelsen at times directed that certain money be sent to clients, which was paid from other client deposits. In other cases, typically in or around spring 2017, clients attempted to withdraw their funds only to be ignored or to be falsely told that their accounts had sustained trading losses.

35. In May 2017, the Promoter met with Casper Mikkelsen in New York City over the course of two days, to discuss GNTFX related business, including GNTFX's purported inability to return money to clients.

36. By June 2017, clients stopped receiving any funds from GNTFX and, by summer 2017, most clients were not receiving any responses from GNTFX. Clients lost a total of at least

$1.19 million pursuant to this scheme and Mikkelsen misappropriated at least $737,000 of client funds for his personal use.

### F. **Mikkelsen Acted As a Commodity Trading Advisor**

37.     During the Relevant Period, Mikkelsen, while acting as a commodity trading advisor ("CTA"), engaged in the business of advising, managing, and trading of leveraged or margined forex transactions on behalf of GNTFX clients, claiming he would receive a commission for every account opened, and compensation based on the "spread" in each trade.

38.     Mikkelsen made use of the mails or any means of interstate commerce in connection with his business as a CTA, in that he controlled the GNTFX Email Addresses and the Flipsidefx Email address and used these email addresses to advise clients and manage and purport to trade forex on their behalf, while also failing to register with the Commission as a CTA.

39.     Mikkelsen exercised discretionary trading authority over accounts of GNTFX clients who were not eligible contract participants ("ECPs"), Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2018), in connection with retail forex transactions. Clients, for example, set up accounts at GNTFX and provided GNTFX with a trader code for Casper Mikkelsen that authorized him to execute trades on their behalf.

40.     Many clients did not meet the threshold of $10 million in assets or did not have $5 million in assets and were not entering into the forex transactions to manage their risks associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred. As such, Casper Mikkelsen was required to register as a CTA and failed to do so.

41.     Further, as described above, Casper Mikkelsen, while acting as an unregistered CTA, made use of the mails and interstate commerce, including websites, emails, Twitter

accounts, and wire transfers, to defraud GNTFX clients by misappropriating client funds and misrepresenting: (1) his historical trading performance; (2) that he would trade their funds to buy and sell forex; and (3) clients' account statements accurately reflected profits and losses of forex trades executed on their behalf.

## V.    STATUTORY AND REGULATORY VIOLATIONS

### COUNT I

**Violations of Section 4b(a)(2)(A), (B), and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (B), (C) (2018)**
**and Regulation 5.2, 17 C.F.R. § 5.2(b) (2019)**
**(FRAUD IN CONNECTION WITH FOREX TRANSACTIONS)**

42.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

43.    7 U.S.C. § 6b(a)(2)(A), (B), and (C), in part, makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, . . . that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market–(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

44.    Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv) (2018), states that Section 4b of the Act, 7 U.S.C. § 6b (2018), applies to retail off-exchange forex transactions, agreements, or contracts, such as those offered by Mikkelsen, as if they were contracts of sale of a commodity for future delivery.

45. 17 C.F.R. § 5.2(b) makes it unlawful:

> [F]or any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail foreign exchange transaction: (1) To cheat or defraud or attempt to cheat or defraud any person; (2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) Willfully to deceive or attempt to deceive any person by any means whatsoever.

46. As described herein, Mikkelsen violated 7 U.S.C. § 6b(a)(2)(A), (B), and (C), and 17 C.F.R. § 5.2(b) by cheating or defrauding, or attempting to cheat or defraud, other persons; making or causing to be made false statements and records; and willfully deceiving or attempting to deceive other persons in connection with the offering of, or entering into, the off-exchange leveraged or margined forex transactions alleged herein, by, among other things: misappropriating client funds, creating fake account statements and misrepresenting: (1) his historical trading performance; (2) that he would use their funds to buy and sell forex; and (3) clients' account statements accurately reflected profits and losses of forex trades executed on their behalf.

47. Mikkelsen engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to: interstate wires for transfer of funds, email, websites, and other electronic communication devices.

48. Mikkelsen engaged in the acts and practices described above willfully or with reckless disregard for the truth.

49. Each act of fraudulent solicitation, misappropriation, and false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A), (B), and (C), and 17 C.F.R. § 5.2(b).

## COUNT II

**Violations of Section 4m(1) of the Act, 7 U.S.C. 6m(1) (2018)
and Regulation 5.3(a)(3), 17 C.F.R. § 5.3(a)(3) (2019)
(FAILURE TO REGISTER AS A COMMODITY TRADING ADVISOR)**

50. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

51. 7 U.S.C. § 6m(1), in part, makes it unlawful:

> [F]or any commodity trading advisor or commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor ….

52. 17 C.F.R. § 5.3(a)(3) requires:

> Any commodity trading advisor, as defined in § 5.1(e)(1) of this part, to register as a commodity trading advisor.

53. Regulation 5.1(e)(1), 17 C.F.R. § 5.1 states:

> *Commodity trading advisor*, for purposes of this part, means any person who exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an eligible contract participant as defined in Section 1a(18) of the Act, in connection with retail forex transactions.

54. Mikkelsen, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any agreement, contract, or forex transaction described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i) (2018), as defined by Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2018), and thus acted as a CTA.

55. Mikkelsen made use of the mails or any means of interstate commerce in connection with his business as a CTA, while failing to register with the Commission as a CTA, in violation of 7 U.S.C. § 6m(1).

56. Mikkelsen exercised discretionary trading authority over accounts of clients who were not eligible contract participants in connection with retail forex transactions as defined in 17 C.F.R. § 5.1(e)(1)

57. Through the actions described above in paragraphs 37-41, Mikkelsen was required to register as a CTA and failed to do so. Accordingly, Mikkelsen violated Section 7 U.S.C. 6m(1) and 17 C.F.R. § 5.3(a)(3).

## COUNT III

**Violations of Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A), (B) (2018)**
**(FRAUD BY A COMMODITY TRADING ADVISOR)**

58. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

59. 7 U.S.C. § 6*o*(1) (2018), in part, makes it unlawful for a CTA to:

> [B]y use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly–(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

60. Mikkelsen violated 7 U.S.C. § 6*o*(1)(A) and (B), in that by use of the mails or any means or instrumentality of interstate commerce, while acting as a CTA, he directly or indirectly employed a device, scheme, or artifice to defraud clients or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon clients, by, among other things: misappropriating client funds, creating fake account statements, and misrepresenting: (1) his historical trading performance; (2) that he would use their funds to buy and sell forex; and (3) that clients' account statements accurately reflected profits and losses of forex trades executed on their behalf.

61.     Each act of fraudulent solicitation, misappropriation, and false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A) and (B).

## VI.     RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l (2018), and under the Court's own equitable powers, enter:

a)      An order finding that Mikkelsen violated Sections 4b(a)(2)(A), (B), and (C), 4*o*(1), and 4m(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A), (B), (C), 6*o*(1), 6m(1) (2018), and Commission Regulations 5.2(b) and 5.3(a)(3), 17 C.F.R. §§ 5.2(b), 5.3(a)(3) (2019);

b)      An order of permanent injunction prohibiting Defendant and any of his, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendant, from directly or indirectly:

(i)     engaging in conduct in violation of Sections 7 U.S.C. §§ 6b(a)(2)(A), (B), and (C), 6*o*(1), and 6m(1) (2018), and 17 C.F.R. §§ 5.2(b), 5.3(a)(3);

(ii)    trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la (2018));

(iii)   entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2019), for Defendant's own accounts or for any account in which he has a direct or indirect interest;

(iv)    having any commodity interests traded on Defendant's behalf;

(v)     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

      (vi)      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

      (vii)      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019);

      (viii)      acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

    c)    An order requiring Defendant and any third party transferee and/or successor thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

    d)    An order directing Defendant and any successors thereof, to rescind, under such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the clients whose funds were received by them as a result of the acts and practices that constituted violations of the Act, as described herein;

    e)    An order requiring Defendant, as well as their successors, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendant's violations (in the amount of such losses), as described

herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

      f)      An order directing Defendant to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by 7 U.S.C. § 13a-1(d)(1) (2018) as adjusted for inflation under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2019) for each violation of the Act, as described herein;

      g)      An order requiring Defendant to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

      h)      Such other and further relief as the Court deems proper.

Respectfully submitted,

Dated: May 18, 2020

*/s/ Xavier Romeu-Matta*
Xavier Romeu-Matta
Trial Attorney
xromeu-matta@cftc.gov

James G. Wheaton
Senior Trial Attorney
jwheaton@cftc.gov

Steven Ringer
Chief Trial Attorney
sringer@cftc.gov

Manal Sultan
Deputy Director

Commodity Futures Trading Commission
140 Broadway 19th Floor

18

New York, NY 10005
(646) 746-9700

*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*